**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

|  |  |
|---|---|
| Hanwha Qcells Georgia, Inc.<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>U.S. CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and the UNITED STATES OF AMERICA<br><br>　　　　　　Defendants. | No. 25-00752 |

**COMPLAINT**

1.　　Plaintiff, Hanwha Qcells Georgia, Inc. ("Qcells" or "Plaintiff"), is a U.S. importer of products subject to the duties challenged in this lawsuit.

2.　　As of February 2025, President Trump, through a series of executive orders, invoked authority under the International Emergency Economic Powers Act ("IEEPA") to levy substantial new tariffs ("IEEPA duties") on merchandise imported from virtually all foreign nations, including those from which Plaintiff procures its goods.

3.　　These tariffs are not authorized by IEEPA — a conclusion already reached by this Court and the Federal Circuit. *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025), cert. granted, No. 25-250, 2025 WL 2601020 (U.S. Sept. 9, 2025).

4.　　By this action, Plaintiff requests that the Court again hold, as it and the Federal Circuit did in *V.O.S. Selections*, that the IEEPA duties imposed by Defendants, as well as the executive orders directing their imposition, are unlawful.

5.　　On November 5, 2025, the Supreme Court heard oral argument in *V.O.S.*

*Selections* and a related case from the District of Columbia, and a decision is anticipated shortly.

6.     This action remains necessary because, even if the Supreme Court invalidates the IEEPA duties and the executive orders behind them, importers—including Plaintiff—will not be guaranteed refunds absent their own judgment and court-ordered relief.

7.     Moreover, the immediacy of this action is compelled by the fact that the entries for which Plaintiff remitted IEEPA-imposed tariffs will commence liquidation—and may attain finality as a matter of law. Plaintiff therefore seeks relief to avert these impending final liquidations and to safeguard its entitlement to a full refund.

8.     Thus, Plaintiff seeks: (i) a declaration that the IEEPA duties are unlawful; (ii) a permanent injunction stopping Defendants from imposing additional duties under the challenged executive orders; and (iii) and a complete refund of all IEEPA duties already paid—and those Plaintiff will continue to pay—under the executive orders at issue.

## PARTIES

9.     Plaintiff, Qcells, is a U.S. Company headquartered in White, Georgia.

10.     Defendant United States Customs and Border Protection ("CBP"), a component of the Department of Homeland Security headquartered in Washington, D.C., is responsible for border security and for collecting tariffs, duties, and taxes on imported goods.

11.     Defendant Rodney S. Scott is the Commissioner of CBP and is sued in his official capacity.

---

[1] *Learning Res., Inc. v. Trump*, 784 F. Supp. 3d 209 (D.D.C. 2025), *cert. granted before judgment*, No. 24-1287, 2025 WL 2601021 (U.S. Sept. 9, 2025).

12.     The United States of America, which collected the disputed tariffs, is the statutory defendant pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1581(i)(1)(B).

13.     Defendants are referred to collectively in this complaint as "CBP".

## JURISDICTION

14.     Jurisdiction over this action lies with the Court pursuant to 28 U.S.C. § 1581(i) and 28 U.S.C. § 2631(i). See *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312, 1334 (Fed. Cir. 2025), cert. granted, No. 25-250, 2025 WL 2601020 (U.S. Sept. 9, 2025).

15.     The Court has the powers of a United States District Court at law, in equity, and by statute. See 28 U.S.C. § 1585. Under 28 U.S.C. § 1581, it may issue money judgments against the United States and provide other civil relief, including declaratory judgments, injunctions, remand orders, and writs of mandamus or prohibition. See 28 U.S.C. §§ 2643(a)(1), (c)(1).

16.     Plaintiff has standing because it is the importer of record for goods subject to the unlawful IEEPA duties collected by CBP. Payment of these duties pursuant to the challenged executive orders has caused Plaintiff injury, which declaratory and injunctive relief from this Court would redress. Plaintiff also faces imminent and irreparable harm, with liquidation of the relevant entries anticipated as early as December 2025.

## GENERAL PLEADINGS

### I.     President Trump invoked IEEPA under his own authority.

#### A.     The IEEPA duties

17.     On February 1, 2025, President Trump issued three executive orders imposing tariffs on goods imported from Canada, Mexico, and China. Each order purportedly relied on IEEPA authority, with the President asserting that the tariffs were necessitated by a national emergency. These orders are collectively identified in this complaint as the "Trafficking Tariff

Orders."

18.     The executive order directed at Mexico, Executive Order 14194, 90 Fed. Reg. 9,117, titled *Imposing Duties To Address the Situation at Our Southern Border* ("Mexico Tariff Order"), imposed an additional 25 percent tariff on goods imported from Mexico. The President asserted emergency authority based on "the grave threat to the United States posed by the influx of illegal aliens and illicit drugs into the United States" and "the failure of Mexico to arrest, seize, detain, or otherwise intercept [drug trafficking organizations], other drug and human traffickers, criminals at large, and illicit drugs."

19.     The executive order directed at Canada, Executive Order 14193, 90 Fed. Reg. 9,113, *Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border* ("Canada Tariff Order"),[3] declared an emergency because of opioid trafficking, and also imposed a 25% tariff, with certain exceptions.

20.     The executive order targeting China, Executive Order 14195, 90 Fed. Reg. 9121, entitled *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China* ("China Tariff Order"), proclaimed a national emergency due to opioid trafficking, noting that "the sustained influx of synthetic opioids" posed a national emergency and that many PRC-based chemical companies "go to great lengths to evade law enforcement and hide illicit substances in the flow of legitimate commerce." The President asserted emergency powers based on "the grave threat to the United States posed by the influx of illegal aliens and illicit drugs into the United States" and the purported failure of the Chinese government "to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other [transnational criminal organizations], criminals at large, and drugs."

---

[2] Exec. Order No. 14194, *Imposing Duties to Address the Situation at Our Southern Border*, 90 Fed. Reg. 9,117 (Feb. 7, 2025)
[3] Exec. Order No. 14193, *Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 9,113 (Feb. 7, 2025)

21.    The China Tariff Order imposed an additional 10% *ad valorem* tariff on products from China imported into the United States on top of existing duties.

22.    Four days later, on February 5, 2025, the President issued another order, Executive Order 14200, *Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*. ("February 5 Amendment").[5]

23.    The next month, on March 3, 2025, the President amended the China Tariff Order again through Executive Order 14228, 90 Fed. Reg. 11,463, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China* ("March 3 Amendment").[6]  The March 3rd Amendment raised the incremental tariffs on imports from China to 20% and justified this increase by claiming that "the PRC has not taken adequate steps to alleviate the illicit drug crisis."

24.    On April 2, 2025, citing trade deficits as a national emergency, President Trump issued Executive Order 14257, 90 Fed. Reg. 15,041 ("Reciprocal Tariff Order"), regulating imports with a reciprocal tariff to address trade practices contributing to large U.S. goods trade deficits. The order imposed a 10% baseline tariff on nearly all imports, effective April 5, and additional tariffs on 57 countries, effective April 9, ranging from 11% to 50%.

25.    On April 2, 2025, citing trade deficits as a national emergency, President Trump issued Executive Order 14257, 90 Fed. Reg. 15,041 ("Reciprocal Tariff Order"), regulating imports with a reciprocal tariff to address trade practices contributing to large U.S. goods trade deficits. The order imposed a 10% baseline tariff on nearly all imports, effective April 5, and additional tariffs on 57 countries, effective April 9, ranging from 11% to 50%.

---

[4] Exec. Order No. 14195, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,121 (Feb. 7, 2025)
[5] Exec. Order No. 14200, *Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9277 (Feb. 11, 2025).
[6] Exec. Order No. 14228, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11,463 (Mar. 7, 2025).

26.     According to the Reciprocal Tariff Order, "U.S. trading partners' economic policies … suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits." See *Reciprocal Tariff Order*.

27.     On April 8, 2025, the President raised the reciprocal tariff on China from 34% to 84% in response to China's retaliatory tariffs. See Exec. Order No. 14,259, 90 Fed. Reg. 15,509, *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports from the People's Republic of China*.

28.     On April 9, 2025, the President suspended for 90 days the higher country-specific tariffs on all countries except for China, for which he raised the "reciprocal" tariff again—from 84% to 125%. Exec. Order No. 14,266, 90 Fed. Reg. 15,625 (Apr. 9, 2025), *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*.[9] Meanwhile, the 20% trafficking tariff on imports from China remained in place, such that most imports from China faced a minimum 145% IEEPA tariff.

29.     In executing the Executive-Order-based tariffs, the Defendant amended the Harmonized Tariff Schedule ("HTS"), mandating that goods subject to the challenged tariffs be entered under new codes.

30.     On April 14, 2025, several companies filed an action in this Court challenging the legality of these tariff orders. *See V.O.S. Selections*, *et al. v. Donald J. Trump*, *et al.*, No. 25-cv-00066 (Dkt. 2). As discussed below, this Court held the orders were unlawful and the Federal Circuit, sitting *en banc*, affirmed.

---

[7] Exec. Order No. 14257, *Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 7, 2025)
[8] Exec. Order No. 14259, *Amendment to Reciprocal Tariffs and Updated Duties As Applied to Low-Value Imports from the People's Republic of China*, 90 Fed. Reg. 15509 (Apr. 14, 2025).
[9] Exec. Order No. 14266, *Modifying Reciprocal Tariff Rates To Reflect Trading-Partner Retaliation and Alignment* (Apr. 9, 2025) 90 Fed. Reg. 15625 (Apr. 15, 2025)

31.     Since the filing of the *V.O.S. Selections* complaint, President Trump has issued further executive orders under IEEPA, imposing additional tariffs and modifying others. As explained below, IEEPA does not authorize such tariffs. Plaintiff here challenges only the orders the Federal Circuit has deemed unlawful (the "Challenged Tariff Orders").

**B.     CBP's implementation of the unlawful tariffs**

32.     CBP is charged with the assessment and collection of duties, including the IEEPA duties. See 19 U.S.C. §§ 1500, 1502.

33.     Congress enacted the Omnibus Trade and Competitiveness Act in 1988, creating a new tariff classification system called the Harmonized Tariff Schedule of the United States ("HTSUS"). Pub. L. No. 100–418, 102 Stat. 1107 (1988). CBP uses the HTSUS to classify imported goods, applying the tariff rates and statistical categories organized into chapters, headings, and subheadings. 19 U.S.C. § 1202. The main headings cover broad types of merchandise, and the subheadings provide more specific classifications. Id. Under CBP regulations, the classification and appraisement of merchandise must follow the HTSUS. 19 C.F.R. § 152.11. The regulation states that merchandise is to be classified according to the HTS, as interpreted through administrative and judicial rulings.

34.     The United States International Trade Commission ("USITC") is responsible for publishing and maintaining the HTS pursuant to presidential orders. 19 U.S.C. §§ 1202, 3005, 3006. Judicial decisions confirm that only the President has the authority to modify the HTSUS. See Michael Simon Design, Inc. v. United States, 33 C.I.T. 1003, 1010 (2009); Maple Leaf Marketing, Inc. v. United States, 582 F. Supp. 3d 1365, 1378–79 (Ct. Int'l Trade 2021).

35.     For all goods entering the United States, CBP is charged with confirming their classification under the HTS and subsequently assessing and collecting any duties owed in accordance with the tariff rates set forth therein. 19 U.S.C. §§ 1202, 1500, 1502.

### C.    Liquidation

36.    CBP regulations define "liquidation" as the final determination of duties owed on consumption or drawback entries. 19 C.F.R. § 159.1.

37.    When goods enter the United States, the importer of record typically pays estimated duties based on its customs declaration, which states the goods' value, origin, and HTSUS classification. See 19 U.S.C. § 1484. CBP then reviews the declaration and may inspect the shipment.

38.    CBP subsequently fixes the final appraisement by confirming the goods' value, classification, duty rate, and the total duty payable. See 19 U.S.C. § 1500.

39.    After CBP fixes the final duty amount, it liquidates the entry and informs the importer of record whether they owe more or are entitled to a refund. See 19 U.S.C. § 1504(b).

40.    By statute, liquidation must take place within one year unless extended. 19 U.S.C. § 1504(a). CBP generally completes liquidation by roughly day 314 after entry and usually posts a notice online.

41.    CBP has discretion to extend the deadline for liquidation for up to one year pursuant to an importer's request and a showing of good cause. *See* 19 U.S.C. § 1504(b)(2); 19 C.F.R. § 159.12(a)(1)(ii).

42.    The Court may — and has in fact — use its equitable powers to stay liquidation. See In re Section 301 Cases, 524 F. Supp. 3d 1355, 1365–66 (Ct. Int'l Trade 2021).

43.    After liquidation of an entry, if the liquidation is of a type that can be protested, the importer has 180 days under 19 U.S.C. § 1514 to file a protest asking CBP to reliquidate. But liquidations based on ministerial (i.e., nondiscretionary) actions — such as a straight calculation

8

of duties — are not protestable. *See* id.; *See* Xerox Corp. v. United States, 289 F.3d 792. *See also* Rimco Inc. v. United States, 98 F.4th 1046, 1053 (Fed. Cir. 2024). *See also* Mitsubishi Elecs. Am. V. United States, 44 F.3d 973.

44.     Both this Court and the Federal Circuit have warned that importers may not be able to reclaim duties paid on entries once liquidation is final—even if the tariff is later ruled invalid. See In re Section 301 Cases, 524 F. Supp. 3d at 1365–66; Target Corp. v. United States, 134 F.4th at 1316.

## II.     IEEPA does not provide authorization for the tariffs.

45.     The Challenged Tariff Orders rely on several statutory authorities: the International Emergency Economic Powers Act (IEEPA, 50 U.S.C. § 1701 et seq.), the National Emergencies Act (NEA, 50 U.S.C. § 1601 et seq.), § 604 of the Trade Act of 1974 (as amended, 19 U.S.C. § 2483), and § 301 of title 3 of the United States Code (3 U.S.C. § 301).

46.     None of the statutes the government invokes—including IEEPA and the National Emergencies Act, the Trade Act of 1974, or 3 U.S.C. § 301 — provide clear authority for the President to impose tariffs. The administration and CBP rely solely on IEEPA to justify and collect the so-called "IEEPA duties," but that statute does not explicitly authorize tariff or duty imposition. Recent judicial rulings reinforce that IEEPA's grant of power to "regulate … importation" does not equate to a grant of taxing or tariff authority.

47.     IEEPA authorizes the President to act only when there is a declared national emergency in response to an "unusual and extraordinary threat," and forbids use of those powers for any other purpose. 50 U.S.C. § 1701(b).

---

[10] CBP can also voluntarily reliquidate within 90 days of the liquidation. *See* 19 U.S.C. § 1501.

48.     Under IEEPA, the President may "investigate, regulate, or prohibit" foreign-exchange transactions, bank transfers involving foreign parties, and the import or export of currency or securities. 50 U.S.C. § 1702(a)(1)(A).

49. IEEPA authorizes the President to control, block, or prohibit the movement, importation, or any transaction involving funds or property in which a foreign country or national has an interest — so long as the property falls under U.S. jurisdiction. 50 U.S.C. § 1702(a)(1)(B).

50.     When the United States is at war or has been attacked, IEEPA permits the President to seize and take control of property — subject to U.S. jurisdiction — owned by a foreign individual, entity, or government deemed responsible for the attack. 50 U.S.C. § 1702(a)(1)(C).

51.     The statute's text does not use the word 'tariff,' nor does it employ any equivalent term such as 'duty,' 'customs,' 'tax,' or 'impost.' *See* 50 U.S.C. § 1701 et seq.

52.     Although IEEPA dates back to 1977 and has undergone amendments, the statute has never been modified to confer tariff-imposing power, and historically no President has invoked IEEPA to levy import duties.

### A.    The U.S. Constitution vests in Congress the power to impose tariffs rather than the President

53.     Under Article I, Section 1 of the Constitution, "all legislative powers herein granted" are vested exclusively in a bicameral Congress of the United States — meaning that lawmaking authority is constitutionally assigned to Congress alone. Under the Constitution, Congress — not the President — is given the power to impose taxes, duties, imposts and excises, and to regulate commerce with foreign nations. U.S. CONST. art. I, § 8, cl. 1 & cl. 3.

54.     Congress delegates to the President any of its constitutionally vested powers, it must provide an intelligible guiding standard. FCC v. Consumers' Research. IEEPA contains no such standard — a deficiency made even clearer by the chaotic manner in which purported "IEEPA duties" have been announced, modified, and retracted.

55.     Interpreting IEEPA to authorize tariffs would be self-contradictory, because doing so would likely require invalidating IEEPA under the non-delegation doctrine — since the statute offers no intelligible principle to constrain such tariff authority.

56.     In "major questions" cases, courts expect Congress to clearly authorize agency or executive action on matters of significant economic or political consequence. See West Virginia v. EPA, 597 U.S. 697, 716 (2022) (quoting Utility Air Regulatory Group v. EPA, 573 U.S. 302, 324 (2014)). If Congress has not done so, courts have found such actions unconstitutional or beyond the Executive's authority. See Biden v. Nebraska, 600 U.S. 477, 505–06 (2023).

57.     By any reasonable standard, the Challenged Tariff Orders constitute a policy of "vast economic and political significance." Yet the statute under which they are promulgated — IEEPA — never mentions "tariffs," "duties," or any equivalent revenue-raising terms, and is not codified alongside the United States' traditional trade laws (which appear in Title 19). Because Congress did not clearly authorize tariff imposition under IEEPA, the Challenged Tariff Orders lack a sufficient statutory basis and therefore cannot lawfully stand — and the defendants are not authorized to implement or collect them.

**B.      Courts have agreed the IEEPA duties are not authorized.**

58.     On May 28, 2025, the CIT granted summary judgment for the plaintiffs in V.O.S. Selections and permanently blocked enforcement of the disputed IEEPA tariffs. That decision was appealed to the Court of Appeals for the Federal Circuit.

59.     The Federal Circuit stayed the lower Court's decision and injunction and

ordered an expedited briefing schedule and hearing.

60.    On August 29, 2025, the en banc Federal Circuit affirmed the CIT's decision in

V.O.S. Selections, Inc. v. Trump, holding that the IEEPA-imposed tariffs exceed presidential

authority. 149 F.4th 1312 (Fed. Cir. 2025); cert. granted, No. 25-250 (Sept. 9, 2025).

61.    A D.C. District Court ruled in Learning Resources, Inc. v. Trump that IEEPA

does not permit the imposition of tariffs. 784 F. Supp. 3d 209 (D.D.C. 2025). The government

appealed, but before further proceedings, the Supreme Court granted certiorari in that case and

the related V.O.S. Selections case, consolidating them for oral argument on November 5, 2025.

**III.    Plaintiff has paid IEEPA duties**

62.    As of the date of this complaint, Plaintiff has paid IEEPA duties imposed by the
Challenged Tariff Orders.

63.    The entries for which Plaintiff has paid IEEPA duties imposed by the Challenged

Tariff Orders are scheduled to begin to liquidate on or around December 2025 or early 2026.

64.    CBP has advised importers that it will not be extending liquidation for entries

subject to IEEPA tariffs.

**STATEMENT OF CLAIMS**
**COUNT I**
**THE CHALLENGED TARIFF ORDERS ARE *ULTRA VIRES* UNDER V.O.S.**
**SELECTIONS**

65.    Plaintiff incorporates paragraphs 1-64 above by reference.

66.    In V.O.S. Selections, Inc. v. Trump, 772 F. Supp. 3d 1350 (CIT 2025),

subsequently affirmed by the Federal Circuit at 149 F.4th 1312 (Fed. Cir. 2025), the Court of

International Trade concluded that the President lacked statutory authority under IEEPA to

impose the contested tariffs.

67.    As the V.O.S. Selections, Inc. v. Trump court explained, IEEPA empowers the

President only to "investigate, regulate, or prohibit" certain foreign-related transactions during a

declared national emergency — such as imports, exports, currency transfers, or the handling of foreign-owned property. IEEPA does not authorize the imposition of tariffs or duties on imports, and neither its text nor its legislative history contains any clear delegation to permit the President to set tariff rates.

68.    The Federal Circuit upheld the CIT's ruling, concluding that Congress—when it enacted IEEPA — did not grant the President authority to impose the tariffs at issue.

69.    The Challenged Tariff Orders mirror those struck down in V.O.S. Selections and rest solely on IEEPA. Because IEEPA does not authorize the imposition of such tariffs, the Orders exceed the President's statutory authority — making them unlawful and void from the start as applied to the Plaintiff.

70.    Plaintiff requests that, consistent with controlling Federal Circuit precedent, the Court declare the Challenged Tariff Orders invalid as to Plaintiff; enjoin CBP from enforcing them against Plaintiff; and require CBP to return all IEEPA duties collected from Plaintiff, plus statutorily mandated interest.

## COUNT II
## ALTERNATIVE CLAIM – THE CHALLENGED ORDERS ARE UNCONSTITUTIONAL

71.    Plaintiff incorporates paragraphs 1-70 above by reference.

72.    In the alternative, even if this Court were to construe IEEPA as authorizing tariffs, the IEEPA-based Tariff Orders would remain unlawful — because such an interpretation would amount to an impermissible delegation of Congress's legislative power to the President, in violation of the Nondelegation Doctrine.

73.    The U.S. Constitution vests in Congress exclusively the power to "lay and collect … Duties".  U.S. CONST. art. I, § 8, cl. 1.

74.     Under separation-of-powers principles and controlling Supreme Court precedent, Congress may not delegate its legislative power to the President without at least providing an intelligible principle to direct and meaningfully limit the President's exercise of that power. IEEPA contains no such intelligible principle — it affords the President sweeping discretion without statutory constraints or standards.

75.     Plaintiff respectfully requests that the Court declare the IEEPA Tariff Orders unconstitutional as applied to Plaintiff, enjoin CBP from enforcing them against Plaintiff, grant an injunction preventing CBP from liquidating IEEPA-affected entries, and order CBP to refund all IEEPA duties collected from Plaintiff, with applicable interest.

### COUNT III
### (DECLARATORY RELIEF, 28 U.S.C. § 2201)

76.     Plaintiff incorporates paragraphs 1-75 above by reference.

77.     A United States court may, under 28 U.S.C. § 2201(a), declare the rights or legal relations of any interested party who requests such a declaration.

78.     There is a real and immediate dispute over whether the President may lawfully impose the challenged IEEPA tariffs and whether CBP may enforce and collect them — making this a proper case for declaratory or injunctive relief.

79.     Plaintiff is an importer of record and has suffered injury by having been required to pay IEEPA duties.

80.     This Court may properly exercise its equitable power to enter a declaratory judgment that the Challenged Tariff Orders are unlawful as applied to Plaintiff, declare that CBP lacks authority to implement or collect the associated tariffs, and thereby grant relief to Plaintiff.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court enter judgment in its favor and grant the following relief as to Plaintiff:

- (a) A declaration that the President lacks authority under IEEPA to impose tariffs;

- (b) A declaration that the Challenged Tariff Orders are ultra vires and void ab initio as applied to Plaintiff;

- (c) A declaration that, as to Plaintiff, U.S. Customs and Border Protection (CBP) lacks authority to implement or collect any tariffs under the Harmonized Tariff Schedule of the United States (HTSUS) based on the Challenged Tariff Orders;

- (d) A permanent injunction preventing CBP, as to Plaintiff, from imposing or enforcing any such tariffs;

- (e) An order directing the United States to refund all IEEPA-derived tariff duties collected from Plaintiff — with interest as allowed by law;

- (f) An award of reasonable costs and attorneys' fees incurred by Plaintiff in bringing this action; and

- (g) Such other and further relief as the Court deems just and proper.

- (h) An award of interest on the refunded duties at the rate authorized by 28 U.S.C. § 1961, or any other applicable statute, from the date of payment to the date of refund.

Respectfully submitted,


/s/ Adrienne Braumiller
Adrienne Braumiller
Braumiller Law Group, PLLC
5220 Spring Valley Road, Suite 200
Dallas, TX 75254
Tel. (214) 348-9306
Adrienne@braumillerlaw.com

*Counsel for Plaintiff*

Dated: December 18, 2025    /s/ George Tuttle
George Tuttle III
Law Offices of George R. Tuttle, A.P.C
3950 Civic Center Drive, Suite 102
San Rafael, CA 94903
Tel. (415) 986-8780
Geo@tuttlelaw.com

*Counsel for Plaintiff*